UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DONALD JOE JAY,<br><br>Defendant. | Case No. 4:20-cr-00195-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Defendant, Donald Jay, has been charged in this case with Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Dkt. 1.) Before the Court is Jay's Motion to Suppress Evidence. (Dkt. 21.) Jay seeks to suppress evidence obtained during a traffic stop. The Court will deny the motion.

**BACKGROUND**

At about 2:40 a.m. on January 4, 2020, a Fort Hall police officer clocked a vehicle speeding 80 miles per hour in a 35 mile-per-hour zone on a rural, residential, two-lane road located on the Fort Hall Indian Reservation. The officer stopped the vehicle due to the excessive speed the vehicle was traveling and the time of day (about 40 minutes after the local bars had closed), suspecting reckless

driving and intoxicated driving.

After approaching the vehicle's driver-side door, the officer encountered the vehicle's two occupants—a female located in the driver's seat and a male located in the front passenger seat. The officer asked the driver for her name, and she responded that her name was "Lily Jay." The officer then asked the passenger for his name. The passenger responded with the name, "Darren Jacobson." This inquiry into the passenger's identity took five seconds.

The officer then said to the passenger, "So, you were driving man. You were driving." Lily Jay interjected, saying, "No, I was driving." The officer then said, "Okay. Where are you guys coming from?" Lily responded, "Fort Hall," then clarified "Gibson." The officer asked Lily if she knew why he had pulled her over, and she admitted she knew it was because she was speeding. The officer stated he had clocked her "going 80 in a 35." Lily responded, "I know."

The officer then asked Lily again for her name. She again said she was "Lily Jay," and the officer radioed her name into dispatch. The officer then again asked the passenger for his name. The passenger again said that his name was "Darren Jacobson," and the officer radioed the name "Darren Jacobson" into dispatch. This second inquiry into the passenger's identity took another five seconds.

At this point, the officer had not yet asked Lily for her driver's license. Lily did, however, have a small wallet in her hand that she was holding against the

steering wheel in a way that allowed the officer to see her identification located in the wallet. Lily voluntarily stated, without prompting, that the identification she was showing the officer was all that she had because her wallet had been stolen and noted that the identification had her maiden name on it. After an exchange between Lily and the officer regarding from where her wallet had been stolen, the officer said, "Okay." He then asked if either Lily or the passenger had consumed any alcohol and added that he had seen a can on the side of the road all kinked up. Lily responded, saying "Oh no, I don't drink. I don't drink whatsoever, nope," shaking her head no. The officer asked Lily if she would allow him to "check your eyes to make sure you are okay?" Lily agreed, and the officer instructed her to step out of the vehicle.

As Lily prepared to open the vehicle's door, she explained to the officer that she is "imbalanced." When the officer asked her what she meant, Lily explained that she had back surgery. She had some difficulty opening the vehicle's door open, attempting three times to open it before the officer helped to open the door. Lily also had some difficulty standing up to get out of the vehicle. Once she got out, the officer directed her to stand near the back of the vehicle.

While Lily was standing at the back of the vehicle waiting, the officer asked the passenger if he had been drinking that evening. The passenger responded that he had not been drinking. The officer then asked the passenger his date of birth.

The passenger responded with a date of birth. The officer radioed the date of birth to dispatch and asked dispatch to send a picture of the individual if they found him in their database. The officer's inquiry into whether the passenger had been drinking and third inquiry into the passenger's identity took twenty-three seconds. During that time, an assisting officer arrived at the scene and stood by the front passenger door.

The initial officer then joined Lily at the rear of the vehicle. He asked her if she had consumed any alcohol or taken any medication. Lily again said she did not drink alcohol but that, ten hours prior, she had taken oxycodone for a recent back surgery. She went on to explain that when she is going to drive, she does not take the medication. The officer asked Lily how long ago she had back surgery, and she responded it was the previous July.

At that moment, dispatch notified the officer that they were unable to locate a "Darren Jacobsen" in the database.[1] The officer immediately asked Lily, in reference to the passenger, "What's his name? Be honest with me." Lily responded that the passenger was her husband, Donald Jay. Thus, at this point, the officer had

---

[1] The officer confirmed during testimony that the search was an NCIC (National Crime Information Center) database search. The NCIC is a national criminal records data system administered by the Federal Bureau of Investigation. *See* 28 U.S.C. § 534.

a reasonable basis to conclude that the passenger had lied about his name. He then asked Lily for her husband's date of birth, which Lily provided. The officer radioed both the name "Donald Jay" and the date of birth to dispatch. He then asked Lily why her husband would lie about his name. She responded that it was because her husband was on probation. Moments later, dispatch notified the officer that Donald Jay was not only on probation but also had a warrant out for his arrest. The officer therefore now had probable cause to arrest the passenger.

The officer then returned to conducting the eye test with Lily—the gaze-nystagmus test. The test results showed no signs of intoxication. After finishing the test, the officer asked Lily if she had anything illegal inside her vehicle. She said no. He then asked Lily if she would consent to having her vehicle searched. She said no.

The officer had Lily sit on the front of his patrol car. He then joined the assisting officer near the front passenger door of Lily's vehicle and informed the passenger that they knew who he was—that he was Donald Jay ("Jay"). The officers instructed Jay to step out of the vehicle. A slight struggle ensued and before the officers were able to handcuff him, Jay threw a meth pipe that he had in his pocket into the back seat of the vehicle. After the officers handcuffed Jay, they placed him in the assisting officer's patrol car.

The initial officer informed Lily that her husband had thrown a meth pipe in

the back of the vehicle and that they now had cause to search the vehicle. The officer placed Lily in the back of his patrol car, explaining she needed to wait there until the officers finished their search. As the officers began to search the vehicle, the initial officer told the assisting officer that he was considering arresting Lily for reckless driving.

During the ensuing search, the officers discovered a handgun near the front passenger seat. It is that handgun that underlies the charges against Donald Jay in the present case.

Following the search, the officers also arrested Lily Jay for reckless driving. After efforts to contact the Jays' family members to come and pick up the vehicle failed, the vehicle was towed.

## LEGAL STANDARD

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Thus, the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). This includes

the vehicle's passengers because "during a traffic stop an officer seizes everyone in the vehicle, not just the driver." *Brendlin v. California*, 551 U.S. 249, 255 (2007).

It is the Government's burden to show by a preponderance of the evidence that a vehicle stop and the resulting seizure of the driver and passengers was lawful. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (burden of proof at suppression hearings is preponderance); *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012) (Government bears burden of showing warrantless search and seizure "falls within an exception to the Fourth Amendment's warrant requirement"); *United States v. Willis*, 431 F.3d 709, 712 (9th Cir. 2005). To meet this burden, the Government must establish, by a preponderance of the evidence, that the stop and resulting seizure was based on "reasonable suspicion: a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878 (1975). Further, the test for determining whether a search or seizure is reasonable and therefore in compliance with Fourth Amendment standards is objective; the subjective intent of an officer is not relevant to that determination. *See Whren*, 517 U.S. at 813 (noting that the Court's previous cases "foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); *Cty. of Los Angeles, Calif. v. Mendez*, 137 S.

Ct. 1539, 1547 (2017) ("the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional").

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Thus, a stop becomes unlawful when it is prolonged "beyond the time reasonably required" to complete the tasks necessary to effectuate the mission of the stop. *Id.*

Finally, when an officer prolongs a stop to conduct an unrelated inquiry, he may do so only on the basis of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also Rodriguez*, 575 U.S. at 355 (an officer may not prolong an otherwise lawful traffic stop to conduct unrelated checks "absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). Thus, an officer may prolong a stop for a traffic violation only if it is "(1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (quoting *Rodriguez*, 575 U.S. at 354).

# ANALYSIS

This case presents what appears to be an issue of first impression: Whether, following *Rodriguez* and *Landeros*, an officer who has reasonable suspicion that the driver of a vehicle has committed an arrestable offense (as opposed to a traffic infraction) may prolong a stop for a reasonable amount of time to inquire into the identity of a passenger absent independent reasonable suspicion that the passenger has committed a criminal offense. As discussed below, the Court answers this question in the affirmative. Specifically, the Court holds that where there is reasonable suspicion that the driver of a vehicle has engaged in an arrestable offense, determining whether the vehicle can be turned over to a passenger becomes part of the mission of the stop, and the officer may thus prolong the stop for a reasonable period of time to inquire into the passenger's identity. Accordingly, in the present case, the officer's prolonging the stop for less than 40 seconds to inquire into the identity of the passenger—Donald Jay—did not run afoul the Fourth Amendment.

    **A.**    ***The officer had reasonable suspicion that the driver had committed an arrestable offense.***

Jay does not dispute that the officer had reasonable suspicion to stop the vehicle for excessive speeding. He also does not dispute that there was reasonable suspicion of reckless driving. And, even if he did, the Court would reject such an

argument because traveling 80 mph—over twice the posted speed limit—on a two-lane road in a rural residential area is more than sufficient to support reasonable suspicion of reckless driving. *See* Law and Order Code, Shoshone-Bannock Tribes of Fort Hall Reservation, Section 10-1-35(a) (defining reckless driving as driving a "vehicle in wanton disregard for the safety of person or property," and providing that a person convicted of reckless driving "shall be punished upon a first conviction of imprisonment of not more than 90 days" and a second or subsequent conviction to imprisonment of up to 6 months). Thus, the Court finds that when the officer stopped the vehicle, he had reasonable suspicion that the driver of the vehicle had committed reckless driving, an offense for which the driver could be, and ultimately was, arrested.

The Court also finds that the officer had reasonable suspicion that the driver may be under the influence of an intoxicant. Again, the vehicle was speeding at more than twice the speed limit on a two-lane rural residential road. The bars had recently closed. Although the officer did not smell any alcohol coming from the vehicle, the driver could have been under the influence of other intoxicants, such as medications. When the driver went to exit the vehicle, she tried to open the door three times before the officer helped her to open the door. As she was exiting the vehicle, she had some difficulty standing up to get out. Soon after she got out of the vehicle, she admitted to the officer that she takes oxycodone (for back pain)

and had taken some about 10 hours prior to the stop. The Court finds that the facts of the case provided the officer with reasonable suspicion of intoxication. The officer did not, therefore, run afoul of the Fourth Amendment by conducting the gaze-nystagmus test to rule out intoxication, which he ultimately did. Moreover, it should be noted that, before the officer conducted the gaze-nystagmus test, he learned that Donald Jay was the passenger and that there was a warrant for his arrest.

  **B.** *The officer's inquiry into Jay's identity did not violate Jay's Fourth Amendment rights.*

Jay argues that the officer violated the Fourth Amendment by prolonging the stop to inquire into his identity without independent reasonable suspicion that he had engaged in criminal activity. The Court disagrees and holds that, because there was reasonable suspicion that the driver had committed the arrestable offense of reckless driving, part of the mission of the stop included determining whether, if the driver were arrested, the vehicle could be turned over to the passenger. Thus, the officer's prolonging the stop for less than 40 seconds to inquire into the identity of passenger Donald Jay, did not violate Jay's Fourth Amendment rights. *See United States v. Diaz-Castaneda*, 494 F.3d 1146, 1154 (9th Cir. 2007).

  In *Diaz-Castaneda*, the officer stopped a vehicle because he suspected that the driver was driving with a suspended license, an arrestable offense. 494 F.3d at

1148-49. After stopping the vehicle, the officer confirmed his suspicion and arrested the driver. *Id.* at 1149. The officer then requested that the passenger provide his identification for the purpose of determining whether the vehicle could be turned over to the passenger. The passenger complied and provided the officer with identification. The officer ran a check on the passenger's information, learned that the passenger had an outstanding immigration detainer, and arrested the passenger based on that detainer. The passenger, who was ultimately charged with illegal reentry into the United States, moved to suppress evidence obtained during the stop. The district court denied the motion and the Ninth Circuit affirmed, explaining: "Here [the officer] wanted to learn not only who the passenger was in a stopped vehicle, but also whether [the passenger] could drive the truck once [the driver] was arrested. [The officer] was therefore free to ask [the passenger] for identification without implicating the Fourth Amendment." *Id.* at 1153.

Here, the officer had reasonable suspicion that the driver had committed the arrestable offense of reckless driving. Thus, under *Diaz-Castaneda*, the officer was free to take a reasonable amount of time to ask the passenger for his identity, and to run a check on his identity, without implicating the Fourth Amendment. *See id.*

The Court recognizes that *Rodriguez* and *Landeros* brought into question the continuing validity of *Diaz-Castaneda. See Landeros*, 913 F.3d at 870 (declining to resolve whether *Diaz-Castaneda* remains valid after *Rodriguez*). However, as discussed

below, the present case is distinguishable from both *Rodriguez* and *Landeros* because neither of those cases involved a stop based on reasonable suspicion that the driver had committed an arrestable offense. Thus, the Court finds *Diaz-Castaneda* to still be valid and controlling for the proposition that, where an officer has reasonable suspicion that a driver has committed an arrestable offense, the officer may take a reasonable amount of time to make inquiries into the passenger's identity for the purpose of determining whether the vehicle can be turned over to the passenger.

Finally, the Court recognizes that, in *Diaz-Castaneda*, the driver was placed under arrest prior to the officer's inquiry into the identity of the passenger. In contrast, in the present case, the inquiry into Jay's identity occurred prior to Lily's arrest. The Court does not find that this difference impacts the outcome of the case. To hold otherwise would require the Court to navigate the slippery slope of determining when the officer formed the subjective intent to arrest, an approach that is foreclosed. *See Whren*, 517 U.S. at 813 (the Supreme Court's prior decisions "foreclose any argument that the constitutional reasonableness of [a seizure] depends on the actual motivations of the individual officers involved"); *see also Mendez*, 137 S. Ct. at 1547 ("the

objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional"). [2]

The Court must, instead, apply an objective standard in determining whether the seizure, and the officer's inquiries during that seizure, were reasonable. *Ibid.* The Court finds, based on the objective facts, that the officer could have arrested Lily for reckless driving from the beginning of the stop and that the officer therefore could take a reasonable amount of time to inquire into the identity of the passenger. *See Diaz-Castaneda,* 494 F.3d at 1153. This conclusion is consistent with *Diaz-Castaneda*, as well as *Rodriguez* and *Landeros.*

C. *Rodriguez v. United States*

In *Rodriguez*, an officer stopped a vehicle after observing the driver commit a traffic infraction (driving on the shoulder of a highway). *Id.* 575 U.S. at 351. The officer obtained the driver's license, registration, and proof of insurance from the driver, and returned to his patrol car to run a records check on the driver. *Id.* The officer then returned to the vehicle, asked for the passenger's driver's license, and began questioning the passenger about where the driver and passenger were

---

[2] Such an approach may also have the unintended and perverse consequence of encouraging officers to arrest drivers rather than issue a ticket and summons to appear for a misdemeanor traffic crime.

coming from and where they were going. *Id.* After the passenger provided identification and answered the officer's questions, the officer returned to his patrol car, completed a records check on the passenger, and called for backup assistance. The officer then began writing a warning ticket for the driver for the traffic infraction. *Id.* The officer then returned to the vehicle to issue the written warning to the driver and gave back to the driver and passenger all of their documents. *Id.* at 352.

Although the purpose for the stop was at that point fully completed, the officer did not give the driver permission to leave. Instead, the officer asked the driver for permission to walk a drug detection dog around the vehicle. The driver said no. The officer then instructed the driver to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer. The driver complied. *Id.* A few minutes later, the second officer arrived, and the initial officer walked his dog around the vehicle. The dog alerted on the vehicle, indicating the presence of drugs, and a search of the vehicle revealed a large bag of methamphetamine. Seven to eight minutes had elapsed between the time the officer returned the driver's and passenger's documents and issued the warning ticket and the time of the dog's alert. *Id.*

The driver of the vehicle was charged with possession with intent to distribute methamphetamine. He moved to suppress the evidence seized from the

vehicle on the ground that the traffic stop was prolonged without reasonable suspicion in order to conduct the dog sniff. *Id.*

The motion to suppress was denied at the district court level, and the denial was affirmed on appeal to the Eighth Circuit. *Id.* at 353. However, the Supreme Court reversed, holding that the officer unlawfully delayed the stop to conduct the dog sniff. *Id.* at 354-58. In so holding, the Court noted that "[a] seizure for a traffic violation justifies a police investigation of that violation" and that "a routine traffic stop is more analogous to a so-called *Terry*-stop that to a formal arrest." *Id.* at 354 (internal quotation marks, citations, and ellipses omitted). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id*. (citations omitted). The Supreme Court explained that "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 355 (quoting *Johnson*, 555 U.S. at 333). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop," but may "not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop." *Id.* (quoting *Caballes*, 543 U.S. at 408). Such inquiries typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* Because the dog sniff was a measure aimed at detecting evidence of ordinary criminal wrongdoing and was not an inquiry incident to the traffic stop, prolonging the stop to allow the sniff was unlawful. *Id.*

In the present case, unlike *Rodriguez*, the officer stopped the vehicle based on reasonable suspicion that the driver had engaged in an arrestable offense. Thus, the mission of the stop was not limited to determining whether to issue a traffic ticket and the ordinary inquiries incident to a stop for a traffic infraction. Instead, the mission of the stop extended to determining whether the vehicle could be turned over to the passenger—Jay—in the event that the officer arrested the driver. *See Diaz-Castaneda*, 494 F.3d at 1153. The officer was therefore allowed to prolong the stop for a reasonable amount of time, here less than 40 seconds, to inquire into the identity of the passenger.

### D. *United States v. Landeros*

In *Landeros*, an officer stopped a vehicle for a traffic infraction of speeding 11 miles per hour over the posted speed limit. 913 F.3d at 864. While talking to the driver, the officer smelled alcohol coming from inside the vehicle. *Id.* The officer suspected that two of the three passengers in the vehicle were underage and violating drinking and curfew laws, both of which are arrestable offenses. *Id.* The officer asked the two suspected underage passengers for their identification, and they complied. The officer also asked the third passenger to identify himself even though the officer did not suspect the third passenger of being underage or otherwise committing a crime. *Id.* at 865. The third passenger refused to give his name despite repeated demands by the officer to identify himself. *Id.* The officer eventually ordered the third passenger to exit the vehicle and discovered the third passenger was a felon in possession of ammunition. *Id.*

The third passenger moved to suppress the ammunition, arguing the stop had been unlawfully delayed. *Id.* The district court denied the motion to suppress, but the Ninth Circuit reversed, holding that the officer's repeated demands for the third passenger to identify himself, without independent reasonable suspicion, unlawfully prolonged the stop. *Id.* at 870 ("Regardless of whether the first request for Landeros's identification was lawful, law enforcement's refusal to take 'no' for an answer was not.").

In the present case, unlike *Landeros*, the officer stopped the vehicle based on reasonable suspicion that the driver had committed an arrestable offense. Thus, the mission of the stop was not limited to determining whether to issue a traffic ticket to the driver, and the ordinary inquiries incident to a traffic stop for an infraction. Instead, the mission of the stop extended to determining whether the vehicle could be turned over to the passenger—Jay—in the event the officer decided to arrest the driver. Again, in making this determination, the officer was allowed to take a reasonable amount of time—here, less than 40 seconds—to inquire into the identity of the passenger, including running a records check on the passenger. *See Diaz-Castaneda*, 494 F.3d at 1153. This inquiry did not, therefore, violate Jay's Fourth Amendment rights.

## ORDER

**IT IS ORDERED** that Defendant Donald Jay's Motion to Suppress (Dkt. 21) is **DENIED.**

**IT IS FURTHER ORDERED** that trial is set for **July 6, 2021, at 1:30 p.m**. at the United States Courthouse in Pocatello, Idaho.

**IT IS FURTHER ORDERED** that the period of time between the filing of the Motion to Suppress (Dkt. 21) and the issuance of this Order is deemed EXCLUDABLE TIME under the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(D).

**IT IS FURTHER ORDERED** that a trial readiness conference will be conducted by telephone on **June 29, 2021, at 9:00 a.m.** mountain time. The Government shall place the call to **(208) 334-9088** with opposing counsel on the line.

IT IS FURTHER ORDERED that all pretrial motions shall be filed on or before **June 28, 2021**.

DATED: June 24, 2021

B. Lynn Winmill
U.S. District Court Judge